NicholsoN, C. J.,
delivered the opinion of the Court.
On the 11th of December, 1857, ¥m. Hodge sold and conveyed the land in controversy to James P. Daniel, for $1,600, and took his notes, payable at one, two and three years, for the payment of which a lien was retained in the deed. Daniel failed to have his deed registered until the 5th of October, 1859. The deed and notes were written by Willis Blanton, who was a subscribing witness to the deed, and who proved its execution before the Clerk of the County Court on the 4th of January, 1859. Two of the notes of Daniel were transferred by Hodge to complainants, Avho have obtained judgments thereon, and who now claim that they are entitled to the vendor’s lien on the land.
This claim is contested by Willis Blanton, on two grounds: First, on the 8th of March, 1861, Blanton bought the land from Daniel, took his deed, with covenants of warranty, and went into possession under this deed; second, on the 8th of September, 1859, Hodge confessed three judgments before a Justice of the Peace, in favor of Blanton, on which executions issued on the 9th of September, 1859, which were levied on the land in controversy on the 12th of September, 1859. The land *163 was condemned at the January Term, 1860, of the Circuit Court, and sold on the 2nd of April, 1860, when Willis Blanton was the purchaser; and on the 25th of November, 1865, the Sheriff executed a deed to Blanton for the land. He now claims to hold the land under the Sheriff’s deed.
It is manifest that Blanton cannot resist the lien of complainants, by virtue of his deed of March, 1861. He was not an innocent purchaser without notice. He wrote the deed from Hodge to Daniel, was a subscribing witness to it, claims title under it as purchaser from Daniel, and was affected with notice of the lien retained on its face.
But if the lien of Blanton’s levies on the land on the 12th of September, 1859, was superior to complainants’ lien, by reason of the non-registration of the deed of Hodge to Daniel until the 5th of October, 1859, the validity of his superior lien would be lost by his after-wards buying the land from Daniel, and by his holding and claiming title under such subsequent purchase. This fact, together with the other circumstances of the case, amount to a waiver and estoppel of his claim, under his purchase at the Sheriff’s sale. Perry v. Calhoun, 8 Hum., 551.
Another question, however, is, whether the judgments on which Blanton procured the land to be levied on and sold, were fraudulent as against complainants, under section 1759 of the Code. In that section, it is enacted that “every bond, suit, judgment or execution, had, or made and contrived, of malice, fraud, covin, collusion or guile, to the intent or purpose to delay, hinder or defraud cred *164 itors of their just and lawful actions/' suits, debts, accounts, damages, penalties, forfeitures, * * * * * shall be deemed and taken only as against the person, his heirs, successors, executors, administrators and assigns, whose debts, suits, demands, estates, or interests,, bjr such guileful and eovinous practices as aforesaid, shall or might be in any wise disturbed, hindered, delayed or defrauded, to be clearly and utterly void; any pretense, color, feigned consideration, expressing of use or any other matter or thing, to the contrary notwithstanding.”
The law sanctions and commands diligence and vigilance on the part of creditors, in securing their just demands. But in the race amongst them for priority, it discountenances and forbids all resorts to eovinous, guileful or fraudulent devices or practices. The section of the Code quoted, which is a copy of the Act of 1801, was intended to secure entire fairness amongst creditors in their efforts to secure their debts. Did Hodge, Daniel and Blan-ton collude together, and by eovinous and fraudulent devices and practices, procure the judgments to be rendered against Hodge, with the purpose of hindering or delaying or defeating complainants in the enforcement of their lien on the land in controversy? The facts proven satisfy us that this question must be answered in the affirmative.
Complainants were known to Blanton, and Hodge, and Daniel, as creditors of Daniel and Hodge, and as owners of the notes for the purchase money of the land. It was known to them that one of the notes was in a judgment, and that the other would be in a judgment soon. It appears that Blanton held three notes on Hodge, one due, and the other two not due. For the *165 avowed purpose of preventing complainants from reaching the land by levy, he proposed to Hodge to give up to him his two notes not due, to deduct the interest and take new notes: and that Hodge should immediately confess judgments, and that executions should be immediately levied on the land as Hodge’s property. This would defeat the lien of complainants, as Hodge’s deed for the land to Daniel had not then been registered. Blanton said to Hodge that his object was to prevent complainants from levying on the land, and thereby befriend Hodge and Daniel. And in March afterwards he took a conveyance from, Daniel of the same land, knowing that Daniel had not paid the purchase money. It would be difficult to conceive a more artfully contrived device than was in this way attempted to be practiced by all three of the parties to defeat the superior lien of complainants.
Hodge has been twice paid for his land. Daniel pockets the money received from Blanton, if any was paid, which belongs of right to complainants; and Blanton has secured a bad debt, and become the owner of the land, leaving ■ complainants with worthless executions against two insolvent men.
These are the results of Blanton’s contrivances to befriend Hodge and Daniel, to procure the land for himself, and to overreach and defeat the lien of complainants, which was his avowed object.
The Chancellor’s decree annuls and vacates the conveyances resorted to for effectuating the scheme of fraud, and restores complainants to their lien. We affirm his decree, with costs.